UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

-------------------------------------------------------------------X

MARIE ANDRE,

Civil Action No.

Plaintiff,

-against-

**COMPLAINT**

Plaintiff Demands

a Trial By Jury

TRINITY HEALTH CORPORATION;

LOURDES CARDIOLOGY SERVICES; HEALTH

MANAGEMENT SERVICES ORGANIZATION, INC.;

MERCEDES FUSCELLARO (*individually*);

JENNIFER GARRON (*individually*);

GAYLE WEXLER (*individually*);

BARBARA HOELFNER (*individually*); and JILLIAN

MOEHER (*individually*)

Defendants

-------------------------------------------------------------------X

Plaintiff, MARIE ANDRE, as and for her Complaint against Defendants respectfully alleges

upon information and belief as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978, and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII"), American with Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq* ("ADA"), 42 USC Section §1981, for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., and the New Jersey Wage and Hour Law, N.J.S.A. §34:11—56a, *et seq.* (the "NJWHL"), and the New Jersey Law Against Discrimination ("NJLAD"). Plaintiff seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of her race, color, and/or national origin and for failing to appropriately compensate Plaintiff under the federal and state laws. Plaintiff was forced to endure a hostile work environment and retaliated against by her employer for reporting such discrimination and harassment.

## JURISDICTION AND VENUE

2. Jurisdiction of this action is conferred upon this court as this action involves a Federal Question under the Civil Rights Act of 1964. The Court also has supplemental jurisdiction over the State Causes of Action.

3. Venue is proper in this district based upon the events at issue taking place within the District of New Jersey.

4. On or around June 24, 2017, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") and the New Jersey Division on Civil Rights (DCR) against Defendants as set forth herein.

5. On or around, December 6, 2017, the EEOC issued Plaintiff a Right to Sue Letter.

6. This action is being commenced within ninety (90) days of Plaintiff's receipt of the EEOC Right to Sue Letter.

## **PARTIES**

7. At all times material, Plaintiff MARIE ANDRE (hereinafter referred to as "Plaintiff" and/or "ANDRE") was and is an individual Black and/or Haitian female, who resides in the State of New Jersey.

8. At all times material, Defendant Trinity Health Corporation (hereinafter referred to as Defendant and/or "TRINITY HEALTH") was and is a foreign corporation authorized to do business in the State of New Jersey.

9. At all times material, Defendant LOURDES CARDIOLOGY SERVICES, (hereinafter identified as Defendant and/or "LCS") was and is a domestic business corporation authorized to do business in the State of New Jersey, located at 500 Grove Street, Haddon Heights, New Jersey 08035.

10. At all times material, Defendant HEALTH MANAGEMENT SERVICES ORGANIZATION (hereinafter identified as Defendant and/or "HMS") was and is a domestic business corporation authorized to do business in the State of New Jersey, with offices located at 100 Front Street 2nd Floor Riverside, New Jersey 08075 and 1113 Hospital Drive, Willingboro, New Jersey 08046 (hereinafter identified as "Willingboro Location").

11. At all times material, Defendant HMS provided management services to Defendant LCS.

12. At all times material, Plaintiff MARIE ANDRE (hereinafter identified as Plaintiff and/or "MARIE ANDRE") is a Black and Haitian female who worked as a Medical Assistant for Defendants at Defendant LCS's Willingboro Location.

13. At all times material, Defendant MERCEDES FUSCERALLO, (hereinafter referred to as Defendant and/or "FUSCERALLO") is a White and/or Caucasian female who held and continues to hold title of Coordinator for Defendants at Defendant LCS's Willingboro Location.

14. At all times material, Defendant JENNIFER GARRON (hereinafter identified as Defendant and/or "GARRON") is a White and/or Caucasian female who held and continues to hold title of Operations Manager for Defendants at Defendant LCS's Willingboro Location.

15. At all times material, Defendant GAYLE WEXLER (hereinafter identified as Defendant and/or "WEXLER") was and continues to be a White and/or Caucasian female who served and continues to serve as a General Human Resource Manager for Lourdes Medical Center in Burlington, New Jersey, and would act as Human Resource Manager for Defendants at Defendant LCS's Willingboro Location.

16. At all times material, Defendant BARBARA HOEFLER (hereinafter identified as Defendant and/or "HOEFLER") was and continues to be a White and/or Caucasian female who served and continues to serve as the Compliance Officer for Defendants at Defendant LCS's Willingboro Location.

17. At all times material, Defendant JILLIAN MOEHER (hereinafter identified as Defendant and/or "MOEHER") was and continues to be a White and/or Caucasian female who held

and continues to hold title of Human Resources Manager for Defendants at Defendant LCS's Willingboro Location.

18. At all times material, Defendants GARRON, FUSCERALLO, WEXLER, HOEFLER, and MOEHER held supervisory authority over Plaintiff.

19. At all times material, Defendants Trinity Health, LCS, and HMS were Defendants GARRON's, FUSCERALLO's, WEXLER's, HOEFLER's, and MOEHER's joint and solo employer.

20. At all times material, Defendants Trinity Health, LCS, and HMS were Plaintiff's joint and solo employer.

## MATERIAL FACTS

21. In or around September 16, 2014, Defendants hired Plaintiff as a Certified Nursing Assistant (C.N.A) for Lourdes Medical Center located at 1600 Haddon Avenue, Camden, New Jersey 08103.   At the time of her hiring, Plaintiff was a Certified Nursing Assistant (C.N.A.) with seventeen years (17) experience.

22. In or around July 2015, Plaintiff applied for and was hired for the position of Registered Medical Assistant (hereinafter identified as "RMA") for Defendant LCS's Willingboro Location.

23. At all times material Plaintiff was Defendants' sole Haitian employee.

24.  Approximately one month upon commencing her new position as an RMA for Defendants, Plaintiff's co-workers began discriminating against Plaintiff because of her Haitian accent.   By means of example only, on a daily basis, Defendant FUSCARELLO

complained to Plaintiff that she was unable to understand Plaintiff's speech because of Plaintiff's Haitian accent and that Plaintiff needed to "fix" her accent, and that until the time came when Plaintiff's accent was "fixed" Plaintiff should "talk slow" to her co-workers and Defendants.

25. In addition to the above, in or around June/July 2015 one of Plaintiff's co-workers, Shelbi Bertino (hereinafter identified as "Ms. Bertino") went so far as to hit Plaintiff in the back with objects.

26. By way of furtherance – on a daily basis, Ms. Bertino, rammed Plaintiff's chair from behind while Plaintiff sat and tried to do her work at her desk.

27. At all times material Plaintiff felt ridiculed and humiliated by the degrading and discriminatory remarks made by her co-workers and Defendant FUSCARELLO concerning Plaintiff's Haitian accent.

28. Shortly thereafter – in or around June/July 2015 Plaintiff reported Ms. Bertino's assault to Defendant FUSCARELLO, who asked Plaintiff to provide her with a statement, which Plaintiff provided to her the same day via email.

29. In or around August/September 2015 and in response to Plaintiff's statement, Defendant FUSCARELLO called Plaintiff and Ms. Bertino into Defendant FUSCARELLO's office wherein she told both women that they could be fired if Human Resources got involved. Defendant FUSCARELLO told Plaintiff and the co-worker that both needed to "scratch the beef," [indicating to stop the hostility].

30. During that same conversation, Plaintiff advised Defendant FUSCERALLO that she did not want to be targeted and discriminated against at work.   Plaintiff further advised that she was being discriminated against on a daily basis because of her Haitian descent.

31. Despite Plaintiff's reports to Defendant FUSCARELLO, Defendants never investigated the reports and failed to take corrective action, and as a result, the discrimination that Plaintiff experienced at the hands of her co-workers and Defendant FUSCARELLO continued.

32. Throughout the remainder of Plaintiff's employment, Defendant FUSCARELLO went on a campaign to harass the Plaintiff by magnifying her scrutiny and ridicule of Plaintiff's accent on a daily basis such that the insults became an office norm, a norm by which Plaintiff's co-workers were increasingly entertained by.

33. As a result of the foregoing, Plaintiff began experiencing severe headaches and high blood-pressure.   On or around January 11, 2016, while Plaintiff was working, Plaintiff's headaches became so severe and her blood pressure became dangerously high such that Plaintiff underwent an EKG and was prescribed blood pressure medicine from Dr. Horowitz who was a physician for Defendant LCS.

34.  Despite the fact that Plaintiff was exhibiting health problems, Defendant FUSCARELLO continued to humiliate Plaintiff by screaming out loud to other co-workers that she could not understand Plaintiff because of Plaintiff's accent.   In addition, on several occasions Defendant FUSCARELLO approached Plaintiff and told Plaintiff that she had to "fix" her accent and that she had to "talk slow."

35. In response to the continued humiliation Plaintiff endured at the hands of Defendant FUSCARELLO and Plaintiff's colleagues, on or around June 14, 2016 Plaintiff reported the above remarks and discriminatory conduct towards her to Human Resource Manager Defendant MOEHER.   Plaintiff further explained that Defendant FUSCARELLO made Plaintiff work additional hours before clocking in and after clocking out, such that the total number of unpaid hours approximated six (6) to seven (7) hours per week.

36.   In response to Plaintiff's report that Defendant FUSCARELLO was forcing her to work additional hours without compensation, Defendant MOEHER advised Plaintiff in words and in substance that Plaintiff should "stop working without pay or we [indicating Defendants] will get in trouble."

37. On or around June 22, 2016 and in response to Plaintiff's report that Plaintiff was being harassed and discriminated because of her race, color, and Haitian origin, Defendant MOEHER forwarded a response to Plaintiff via email stating in words and in substance "we will be in touch shortly."   However, Plaintiff did not receive any communication from Defendant MOEHER until after Plaintiff's wrongful termination.

38. Approximately a few days later, Defendant GARRON, who had just returned from vacation, approached Plaintiff in follow-up to Plaintiff's reports to Defendant MOEHER concerning the discrimination Plaintiff was enduring from her co-workers and Defendant FUSCARELLO because of Plaintiff's race, color, and Haitian origin.

39. At some point during the conversation Plaintiff asked Defendant GARRON if she could provide Plaintiff with the contact information of the Counseling Center that employees could go to for purposes of dealing with stress and anxiety. Despite Defendant GARRON's

assurances to Plaintiff that Defendant GARRON would "look into" Plaintiff's concerns and despite her promise to Plaintiff that she would follow-up with her for the contact information for the Counseling Center, Defendant GARRON failed to conduct a proper investigation and never provided Plaintiff with contact information for the Counseling Center.

40. Because Defendants neither conducted a proper investigation nor took corrective action, Defendant FUSCARELLO and her employees continued to harass Plaintiff because of Plaintiff's race, color, and Haitian national origin.

41. Defendant FUSCARELLO often had an African American employee act as an interpreter between Plaintiff and Defendant FUSCARELLO.   Whenever an African American co-worker was chosen by Defendant FUSCARELLO to act as an interpreter, said co-worker would repeat everything that Plaintiff said to Defendant FUSCARELLO as Defendant FUSCARELLO pretended neither to hear nor understand Plaintiff, despite the fact that Plaintiff would talk directly to her.

42. In response, Plaintiff was horrified, felt ridiculed, embarrassed and emotionally distraught by Defendant FUSCARELLO's actions against her and at all times material Plaintiff feared losing her job in retaliation for reporting the harassment.

43. In or around February 2017 and still not having heard back from Defendant GARRON, Plaintiff, who still feared losing her job, followed-up with Defendant GARRON via phone call and stated in words and in substance that Plaintiff felt her rights were being "violated" at work by Defendant FUSCARELLO and Plaintiff's co-workers, but that Plaintiff was scared to come forward with more detail out of fear of losing her job in retaliation.

44. A few days later, Defendants' Operation Manager Defendant GARRON reported to Defendant LCS's Willingboro Location wherein she first spoke to Defendant FUSCARELLO by herself.   Upon speaking to Defendant FUSCARELLO, Defendant GARRON spoke to Plaintiff by herself wherein Plaintiff disclosed all of the hostility exhibited towards her from her co-workers and Defendant FUSCARELLO because of Plaintiff's race, color, and Haitian origin.

45. Immediately after speaking to Plaintiff by herself, Defendant GARRON spoke to both Defendant FUSCARELLO and Plaintiff together.   During the conversation therein, Plaintiff felt an acute sense of panic that there was absolutely no one who could protect Plaintiff from the hostile work environment of which she continued to endure.

46. Throughout her conversation held with Plaintiff and Defendant FUSCARELLO together, Defendant GARRON disregarded the severity of Plaintiff's hostile work environment as Defendant FUSCARELLO pretended everything was okay and that Plaintiff's concerns were just a figment of Plaintiff's imagination.

47. Defendants never conducted a meaningful investigation of Plaintiff's reports and failed to take corrective action, and as a result thereof, Defendant FUSCARELLO continued her discriminatory conduct towards Plaintiff while also condoning the harassment exhibited by her employees towards Plaintiff because of Plaintiff's race, color, and Haitian origin.

48. In or around April 2017, Defendant FUSCARELLO asked Plaintiff: "do you eat dirt", after Defendant FUSCARELLO had seen a documentary that showed Haitian people resorting to eating dirt following natural disasters that had occurred in Haiti.

49.   By way of furtherance, despite Plaintiff's earlier reports to Defendant MOEHER concerning the unpaid hours forced upon Plaintiff by Defendant FUSCARELLO, Defendant FUSCARELLO continued to force Plaintiff to work two to three hours a day after clocking out from work all of which were past her 40-hour work week without compensation.

50.  The forced unpaid labor coupled with the discriminatory conduct and comments towards her caused Plaintiff to experience chest pains, derivative of the hostile work environment which Plaintiff was forced to endure on a daily basis.

51.  Defendant FUSCARELLO told Plaintiff that since there wasn't any money for the approval of overtime hours Plaintiff had to do the extra work in order to keep her job. Defendant FUSCARELLO would also force Plaintiff to log out in her presence and then work additional hours.

52.  Plaintiff asked FUSCARELLO on several occasions to be compensated and was reminded by FUSCARELLO that Plaintiff had a family, a car payment and a mortgage to pay and that Plaintiff would not be able to pay those bills if she were unemployed.

53.  Plaintiff was told by FUSCARELLO that Plaintiff had to do what FUSCARELLO said or that she would be fired.

54.  Moreover, FUSCARELLO would often tell Plaintiff that she had to keep the doctor's happy in order to keep her job and that entailed working uncompensated daily overtime. Plaintiff was the only worker singled out by FUSCARELLO to work unpaid overtime.

55. Plaintiff felt hopeless in light of Defendant FUSCARELLO's constant threats. Plaintiff was also too scared about losing her job and did not make any further reports to Human Resources and continued working hours upon hours without pay.

56. To maintain her control over Plaintiff, Defendant FUSCARELLO would intimidate Plaintiff by getting close to her face and aggressively pointing her finger at Plaintiff and threatening Plaintiff with job termination.   Defendant FUSCARELLO made sure to do this in the presence of other co-workers.

57. As a result, Plaintiff feared Defendant FUSCARELLO and believed Defendant FUSCARELLO would carry through with her threats of termination.

58. On or around June 8, 2017, Plaintiff presented to the emergency room at LOURDES HOSPITAL ER for Gastric issues with bloody stools whereby she was diagnosed with Inflamed Hemorrhoids because of the stress Plaintiff was forced to endure from the hostile work environment at work.   Plaintiff was not discharged until on or around June 9, 2017.

59. On or around June 13, 2017 almost immediately upon clocking into work around 7:15 am or so, Plaintiff realized she forgot her stethoscope at home.   In a panic, Plaintiff rushed to house, which was approximately three (3) minutes away to retrieve her stethoscope and reported back to work immediately thereafter.

60. Approximately three (3) days later, Defendant FUSCARELLO approached Plaintiff and stated that she had security pull video footage wherein Plaintiff was seen leaving the office almost immediately upon clocking into work.   In response, Plaintiff apologized and explained that she was undergoing health problems and had been hospitalized from June 8, 2017 through June 9, 2017 wherein she was diagnosed with Inflamed Hemorrhoids.

Plaintiff further explained that she had rushed to get to work and did not realize that she had forgotten her stethoscope in haste, until shortly after clocking into work.

61. In response, Defendant FUSCARELLO screamed in words and in substance that she did not care that Plaintiff had been to the Emergency Room from June 8, 2017 through June 9, 2017 because that was Plaintiff's "business."   Defendant FUSCARELLO further accused Plaintiff that Plaintiff had "violated" her "trust" and that Plaintiff did not in fact have heart problems and thereafter directed Plaintiff to return to Plaintiff's desk "and start working."

62.  Immediately upon returning to her desk, Plaintiff turned to her co-worker Erin Bryant (hereinafter identified as "Ms. Bryant") and asked her if she could log into the hospital site for Plaintiff and print out Plaintiff's Emergency Room records from June 8, 2017 through June 9, 2017.   Ms. Bryant honored Plaintiff's request and printed out Plaintiff's Emergency Room records.

63. Immediately thereafter, Plaintiff presented her Emergency Room records to Defendant FUSCARELLO to prove that Plaintiff was telling the truth. In response, Defendant FUSCARELLO began screaming at the top of her lungs that both Plaintiff and Ms. Bryant were "fired."   Defendant FUSCARELLO further added in words and in substance, "I do not want to see this [indicating Plaintiff's Emergency Room records] and that Plaintiff was in violation of HIPAA Compliance for asking her co-worker to go into Plaintiff's own medical chart.

64. In response, Plaintiff explained that she did not understand why Defendant FUSCARELLO was accusing Plaintiff of a compliance violation when Defendant FUSCARELLO had given Plaintiff permission to print out hospital records for a co-worker

Patrice Pschneider (hereinafter identified as "Ms. Pschneider") regarding medical records pertaining to Ms. Pschneider's husband, records of which were not from Defendant LCS. Plaintiff further added, that Plaintiff's own medical records were from Defendant LCS.

65. Defendant FUSCARELLO ignored the arbitrariness of the foregoing and stated in words and in substance, "It doesn't matter. You don't have a heart problem, so you are not a patient of the office." In response, Plaintiff suggested that she could have Ms. Bryant sign a consent form that allows her to go into Plaintiff's chart." However, Defendant FUSCARELLO retorted in words and in substance, "No. It's too late. Throw the paper [indicating Plaintiff's printed Emergency Room records] everything is fine. [indicating that Plaintiff and Ms. Bryant were not going to be fired]."

66. On or around July 10, 2017, Defendant FUSCARELLO approached Plaintiff in the presence of Plaintiff's co-workers and stated in words and in substance, "You have an appointment with compliance tomorrow at 12:45 p.m." In response, Plaintiff feared that she was going to lose her job and timidly replied, "Okay."

67. Sometime thereafter and on that same day, Plaintiff's husband was experiencing an emergency and attempted to reach Plaintiff on her cell-phone throughout the day. Finally, Plaintiff was able to return her Husband's call, wherein her Husband explained to Plaintiff that she needed to leave work as soon as possible to take him to the airport as his sister who lived in Haiti was re-diagnosed with Breast Cancer and did not have long to live.

68. Almost immediately after speaking to her Husband, Plaintiff approached Defendant FUSCELLARO and asked for permission to leave early from work due to a family emergency. In response Defendant FUSCELLARO reluctantly replied yes, however,

almost immediately after signing off from her computer, as Plaintiff walked by Defendant FUSCARELLO's office she asked Plaintiff in words and in substance, "is your Husband that sick that you have to go home."   In response, Plaintiff replied in words and in substance, "he had an emergency, but he is not sick."

69.   Immediately thereafter Defendant FUSCELLARO began to yell at Plaintiff in words and in substance, "you also know you're not supposed to use your cell while at work," to which Plaintiff objected that she did not use her cell phone.   Defendant FUSCARELLO retorted with words to the effect of, "the girls [indicating Plaintiff's co-workers] told me you were on your cell-phone."

70.   Plaintiff again objected and further explained that her husband had in fact called Plaintiff several times but that the calls were not going through, so her husband texted Plaintiff. Plaintiff eventually received the text messages on her Fitbit.   Defendant FUSCARELLO demanded Plaintiff to allow her to look at the text messages to verify Plaintiff was telling the truth. Plaintiff complied and so Defendant FUSCARELLO allowed her to go home.

71. On or around July 11, 2017, Plaintiff reported to work for her Compliance Meeting, wherein Plaintiff met with Compliance Officer Defendant HOELFNER and Defendants WEXLER and FUSCELLARO.   During the meeting Plaintiff explained Defendant FUSCELLARO's arbitrary decision making concerning the incident in late June 2017 when Plaintiff had requested her co-worker to pull Plaintiff's Emergency Room records from June 8, 2017 – June 9, 2017 to explain why Plaintiff had rushed back home to retrieve her stethoscope early in the morning on June 13, 2017.

72. At the end of the meeting Defendant HOELFNER thanked Plaintiff for coming forward with her complaints and asked Defendant WEXLER to "look into" Plaintiff's reports of discriminatory treatment. Throughout the entire meeting with Defendant WEXLER and Plaintiff, Defendant HOELFNER took notes.

73. As Plaintiff was about to leave, Defendant HOELFNER asked Plaintiff if she had "anything else to say" to which Plaintiff responded that she was not able to come forward with everything and that she was already frightened enough that she would be retaliated against by Defendant FUSCARELLO for meeting with Defendant HOELFNER and Defendant WEXLER.

74. Fearing that Defendant HOELFNER was going to show Defendant FUSCARELLO the notes she had been taking throughout the entire meeting, Plaintiff further added that she would like to speak to Defendant WEXLER in private, however, Defendant WEXLER replied that would not be able to speak with Plaintiff anymore that day as Defendant WEXLER had another scheduled meeting with Defendant HOELFNER.   Thereafter both Defendant WEXLER and Defendant HOELFNER provided Plaintiff with their business cards and assured Plaintiff that she could call either one of them to schedule a meeting for a different day.

75. Shortly thereafter, Plaintiff called Defendant WEXLER in private and made an appointment to speak to her at 4:30 the next day.

76. The next day – July 12, 2017, Plaintiff presented to Defendant WEXLER's office for her scheduled meeting at 4:30 p.m. Defendant WEXLER disregarded the severity of Plaintiff's hostile work environment and stated in words and in substance that there was nothing she

could do since she was not the Human Resource Manager for Defendants' Willingboro Location Office, but that Defendant MOEHER would contact Plaintiff as soon as Defendant MOEHER returned from vacation. However Defendant MOEHER never contacted Plaintiff until after Plaintiff's wrongful termination on July 19, 2017.

77. A few days later – on or around July 17, 2017, Plaintiff approached Defendant GARRON and asked if she could speak to her concerning Plaintiff's previous reports of the discrimination by her co-workers and Defendant FUSCARELLO because of Plaintiff's race, color, and Haitian origin. During that conversation Plaintiff again asked for the contact information of Defendants' Counseling Center as she had yet to receive the contact information from Defendant GARRON. In response, Defendant GARRON maintained that she had emailed the contact information to Plaintiff the same day Plaintiff initially requested it form her, however Plaintiff replied that she had never received such email.

78.   At some point during the conversation, Defendant GARRON explained that Defendant FUSCARELLO had accused Plaintiff of "stealing company time."   Plaintiff objected to the false allegations against her and pointed out all of her colleagues who had in fact stole company time and violated compliance policy but who nonetheless did not face any repercussions.

79.   Plaintiff further added that one of her co-workers, Erin Bryant had informed Plaintiff that Defendant FUSCARELLO often referred to Plaintiff as the "Black Sheep" in the office in front of Plaintiff's co-workers.

80. In response, Defendant GARRON suggested to Plaintiff that Plaintiff resign if Plaintiff's job was causing her too much stress, however Plaintiff responded that she needed the job

and she liked working with patients despite the hostility she endured from her co-workers and Defendant FUSCARELLO.

81. Defendant GARRON replied in words and in substance, that she was not at the office to fire Plaintiff and that it was up to Defendant HOELFNER and Defendant GARRON to do so and that she wished Plaintiff good luck no matter what decision Defendant HOELFNER and Defendant GARRON made.

82. Approximately two days later - or around July 19, 2017, Defendants unlawfully fired Plaintiff from her position and advised Plaintiff that she was terminated because it just wasn't going to work out. because she violated company policy.    In addition, Defendants GARRON and HOELFNER accused Plaintiff of "stealing company time" and advised that there was a video showing Plaintiff leaving her work area.

83. Plaintiff responded, "I am being fired for leaving the office for 7 minutes for "stealing company time" to get my tools I need for work, when not only was I coming into work before my actual work hours to accommodate the office, for over a year."    Plaintiff also added that approximately one year ago, Plaintiff had come forward to Defendants and reported the unpaid overtime that Defendant FUSCARELLO forced upon Plaintiff.

84. On July 20, 2017, Plaintiff received a phone call from Defendant MOEHER advising Plaintiff that she was aware of the uncompensated overtime hours that Plaintiff worked and asked Plaintiff to put together a list of the dates that she worked uncompensated.

85. Defendant MOEHER further advised Plaintiff that she was also being terminated for an incident that had happened in January, however, Defendant MOEHER refused to identify the alleged incident to Plaintiff.

86. In response, Plaintiff explained to Defendant MOEHER that she had not received a verbal or written warning about the incident and wanted to know what Plaintiff was accused of by the resident. Plaintiff further pointed out that she never signed an acknowledgement of this incident or was reprimanded for the incident. Yet, Plaintiff was fired more than six (6) months after the incident occurred.

87. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

88. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered, she is subject to future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

89. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against all the Defendants, jointly and severally.

90. Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

91. The above are just some examples of some of the discrimination and retaliation to which Defendants subjected Plaintiff.

**AS A FIRST CAUSE OF ACTION**

## UNDER FEDERAL LAW

## 42 U.S.C. Section 1981

## (Discrimination and Retaliation)

92. Plaintiff, individually and on behalf of all persons similarly situated, repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

93. 42 USC Section 1981 states in relevant part as follows:

    (a)    Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. (b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

94. Plaintiff, as a member of the Black and/or African-American race, was discriminated against by Defendants because of his race as provided under 42 USC Section 1981 and has suffered damages as set forth herein. Plaintiff also claims unlawful retaliation under 42 U.S.C. 1981 for his opposition to Defendants' unlawful employment practices.

## AS A SECOND CAUSE OF ACTION

## FOR DISCRIMINATION UNDER TITLE VII

## (Not Against Individual Defendants)

95. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

96. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2 states in relevant parts as follows: *[Section 703]*(a) Employer practices: It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."

97. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff on account of her race, color, and/or national origin.

98. As such, Plaintiff has been damaged as set forth herein.

## AS A THIRD CAUSE OF ACTION
## FOR RETALIATION UNDER TITLE VII
### (Not Against Individual Defendants)

99. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

100.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be an unlawful employment practice for an employer: "(1) to…discriminate against any of his employees…because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.."

101.     Defendants engaged in an unlawful discriminatory practice prohibited by 42

U.S.C. §2000e *et seq.* by retaliating and otherwise discriminating against Plaintiff

because of Plaintiff's opposition to and reporting of Defendants' unlawful employment

practices.

102.     As such, Plaintiff has been damaged as set forth herein.


### AS A FOURTH CAUSE OF ACTION FOR DISCRMINATION UNDER THE AMERICANS WITH DISABILITIES ACT

### (Not Against Individual Defendants)


**103.**     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

**104.**     Plaintiff claims Defendants violated the Americans with Disabilities Act of 1990

(Pub. L. 101-336) (*ADA*), as amended, as these titles appear in volume 42 of the United

States Code, beginning at section 12101.

**105.**     Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter

I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered

entity shall discriminate against a qualified individual on the basis of disability in regard

to job application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of

employment."

**106.**     Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her disability.

**107.**     As such, Plaintiff has been damaged as set forth herein.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

108.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

109.     The New Jersey Law Against Discrimination ("NJLAD") Section 10:5-12(a) sets forth in pertinent part as follows: "It shall be an unlawful employment practice, or as the case may be, an unlawful discrimination: a) For an employer, because of…disability,…to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

110.     The full statute reads as follows: **10:5-12. Unlawful employment practices, discrimination.**   It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any

individual, or because of the refusal to submit to a genetic test to an employer, to refuse

to hire or employ or to bar or to discharge or require to retire, unless justified by lawful

considerations other than age, from employment such individual or to discriminate

against such individual in compensation or in terms, conditions or privileges of

employment; provided, however, it shall not be an unlawful employment practice to

refuse to accept for employment an applicant who has received a notice of induction or

orders to report for active duty in the armed forces; provided further that nothing herein

contained shall be construed to bar an employer from refusing to accept for employment

on the basis of sex in those certain circumstances where sex is a bona fide occupational

qualification, reasonably necessary to the normal operations of the particular business or

enterprise; provided further that nothing herein contained shall be construed to bar an

employer from refusing to accept for employment or to promote any person over 70 years

of age; provided further that it shall not be an unlawful employment practice for a club

exclusively social or fraternal to use club membership as a uniform qualification for

employment, or for a religious association or organization to utilize religious affiliation

as a uniform qualification in the employment of clergy, religious teachers or other

employees engaged in the religious activities of the association or organization, or in

following the tenets of its religion in establishing and utilizing criteria for employment of

an employee; provided further, that it shall not be an unlawful employment practice to

require the retirement of any employee who, for the two-year period immediately before

retirement, is employed in a bona fide executive or a high policy-making position, if that

employee is entitled to an immediate non-forfeitable annual retirement benefit from a

pension, profit sharing, savings or deferred retirement plan, or any combination of those

plans, of the employer of that employee which equals in the aggregate at least

$27,000.00; and provided further that an employer may restrict employment to citizens of

the United States where such restriction is required by federal law or is otherwise

necessary to protect the national interest.

111.     Defendants engaged in unlawful employment practices prohibited by NJLAD §

10:5-12 *et seq*., by discriminating against Plaintiff because of Race, Color and/or

National Origin.

112.     Plaintiff hereby makes a claim against Defendants under all the applicable

paragraphs of NJLAD § 10:5-12.

**AS A SIXTH CAUSE OF ACTION**
**FOR RETALIATION UNDER STATE LAW**

113.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this Complaint.

114.     The NJLAD § 10:5-12(d) sets forth that it is unlawful "[f]or any person to take

reprisals against any person because that person has opposed any practices or acts

forbidden under this act or because that person has file a complaint, testified or assisted in

any proceeding under this act or to coerce, intimidate, threaten or interfere with any

person in the exercise or enjoyment of, or on account of that person having aided or

encouraged any other person in the exercise of, any right granted or protected by this act.

115.     Defendants violated NJLAD § 10:5-12(d) as set forth herein.

**AS A SEVENTH CAUSE OF ACTION**

**<u>FOR AIDING AND ABETTING UNDER STATE LAW</u>**

116.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this Complaint.

117.    The NJLAD § 10:5-12(e) sets forth in pertinent part as follows: "Unlawful

employment practices, discrimination. It shall be an unlawful employment practice, or, as

the case may be, unlawful discrimination: e) For any person, whether an employer or an

employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts

forbidden under this act, or attempt to do so."

118.    Defendants engaged in an unlawful discriminatory practice in violation of NJLAD

§ 10:5-12(e) by aiding, abetting, inciting, compelling, and coercing the discriminatory

conduct against the Plaintiff has set forth herein.

**<u>AS AN EIGHTH CAUSE OF ACTION</u>**

**<u>FOR A VIOLATION OF</u>**

**<u>THE FAIR LABOR STANDARDS ACT OF 1938,</u>**

**<u>AS AMENDED 29 U.S.C. § 201, *et.seg.*</u>**

119.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

120.    Plaintiff is an employee within the meaning of the Fair Labor Standards Act.

121.    Defendants is an employer within the meaning of the Fair Labor Standards Act.

122.     Defendants deliberately did not pay Plaintiff for time worked in excess of forty (40) hours per week at a rate of time and one half.

123.     At all times material, Defendants determined the rate and method of Plaintiff's compensation.

124.     Defendants were required by law to pay Plaintiff for all time worked and for at least one and one-half times his regular rate of pay for hours worked in excess of forty (40) hours per week.

125.     Plaintiff's regular rate of pay consisted of an hourly rate of $16.80 per hour.

126.     Defendants intentionally failed to pay Plaintiff at the rate of time and one half for all time worked in excess of forty (40) hours per week.

127.     Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of The Fair Labor Standards Act of 1938.

## AS A NINETH CAUSE OF ACTION
## FOR FAILURE TO PAY OVERTIME IN VIOLATION OF
## THE NEW JERSEY WAGE AND HOUR LAW ARTICLE 19

128.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

129.     Defendants are "employers" within the meaning of the New Jersey Hour and Wage Law ("NJWHL").

130.    At all relevant times, Plaintiff was employed by Defendants within the meaning of the NJWHL.

131.    Defendants willfully violated Plaintiff's rights by unlawfully classifying him as an exempt employee and failing to pay him overtime compensation at rates not less than one and one-half his regular rate for each hour worked in excess of forty (40) hours in a work week.

132.    As a result of the Defendants' violations of the NJWHL, Plaintiff has suffered damages in amounts to be determined at trial.

133.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of The New Jersey Wage and Hour Law.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  March 5, 2018                          **DEREK SMITH LAW GROUP, PLLC**

    **Philadelphia, PA**     **Attorneys for Plaintiff**

By: /s_____
    **Chloe E. Gartside, Esquire**
    **1845 Walnut Street, Suite 1600**
    **Philadelphia, Pennsylvania 19103**
    **(215) 391-4790**